PESQUERA, PLAINTIFF AND APPELLANT, *v.* FERNÁNDEZ ET AL.,
DEFENDANTS AND RESPONDENTS.

APPEAL from the District Court of San Juan, Section 1, in
an Action of Ejectment and for Damages.

No. 1160.—Decided February 10, 1915.

POSSESSORY TITLE—DOMINION TITLE—RECORD OF TITLE—EVIDENCE—JUDICIAL
ORDER OF APRIL 4, 1899.—The period of twenty years prescribed by article
393 of the Mortgage Law for the conversion of a possessory title into a
dominion title having been reduced to six years by the Judicial Order of
April 4, 1899, and the possessory title proceeding in this case having been
recorded in 1894 and its conversion into a dominion title having been recorded
in 1911, the period of six years had more than elapsed, counting not only
from 1894 but from April 4, 1899, therefore it must be concluded that the
dominion title was secured and recorded according to law and was properly
admitted in evidence.

RES JUDICATA—DOMINION TITLE—CONTESTANTS.—The decision of the court dis-
missing the contest in proceedings for the conversion of a possessory title
into a dominion title does not constitute *res judicata* as to the rights of the
contestants.

EJECTMENT—EVIDENCE.—In an action of ejectment it is essential that the plain-
tiff prove not only his right to recover the thing detained, but also the
identity of the thing itself.

EVIDENCE—PASSION, PREJUDICE OR PARTIALITY—ERROR.—In the present case the evidence as to the ownership of the parcels of land referred to in the complaint was contradictory, and in the absence of a positive showing that the trial court was influenced by passion, perjudice or partiality, or committed manifest error, its findings thereon must prevail.

OWNERSHIP—PRESCRIPTION—JUST TITLE—GOOD FAITH.—Ownership is lost or acquired by prescription and in order to acquire title by the extraordinary prescription of thirty years neither just title nor good faith is required.

DAMAGES—EVIDENCE.—Iu a case of this kind a prayer for damages by one of the parties will not be sustained when no affirmative evidence has been introduced to show what damages may have been caused.

The facts are stated in the opinion.

Mr. José L. Pesquera for the appellant.

Mr. Henry G. Molina de St. Remy for the respondents.

·MR. JUSTICE DEL TORO delivered the opinion of the court.

This is an action of ejectment and for damages. The plaintiff, José de Jesús Pesquera, alleging that he is the owner of thirteen lots lying within the boundaries of a property of four *cuerdas* of land called "Maturí" situated on the outskirts of the. town of Bayamón, prayed the court for a judgment ordering the defendants to vacate the said lots unlawfully occupied by them and to pay to the plaintiff the sum of $3,000 damages. The defendants alleged that, in fact, they were in possession of the said lots, but not unlawfully, as they had occupied them as owners for more than thirty years. In a cross-complaint filed by the defendants they acknowledged that in 1894 proceedings had been instituted to establish a possessory title to the "Maturí" property and that in 1911 proceedings were brought to convert the possessory title into a dominion title, but alleged that when the said proceedings were prosecuted they were in possession of the lands which they now occupy as owners and were not summoned in any manner whatever, and they pleaded title by prescription.

Such, in summary, is the issue in this case.

After ruling upon demurrers to the answer and to the cross-complaint filed by the plaintiff, the case went to trial and both parties introduced evidence, whereupon the case

was finally submitted to the court for judgment. On January 12, 1914, judgment was rendered and on March 17, 1914, it was amended, it holding finally that the defendants are the absolute owners and entitled to the possession which they now hold of the respective lots and houses described in the fifth paragraph of the complaint; that the possessory title to the "Maturí" property, which includes the lands of the defendants, and also the conversion of the said possessory title into a dominion title, are null and void; that the records in the registry of property in favor of plaintiff Pesquera should be canceled as to that part of the property "Maturí" which belongs to all the defendants except Inés Marín, and that the plaintiff pay the costs and disbursements.

The plaintiff took this appeal from the said judgment, filed his brief at the proper time and in the proper manner and appeared at the hearing on the appeal on November 11, 1914. The defendants only appeared at the hearing on the appeal.

In his brief the plaintiff-appellant contends that the trial court erred (1) in overruling the demurrer to the answer; (2) in overruling the demurrer to the cross-complaint; (3) in weighing the evidence; (4) in failing to rule upon two material questions raised by the plaintiff in his answer to the cross-complaint, namely, misjoinder of cross-plaintiffs and *res judicata;* (5) in not determining in the judgment the separate rights of each defendant; (6) in adjudging the defendants to be the owners of the lots described in clause 5 of the complaint; (7) in amending the judgment after it had been appealed from; (8) in making no pronouncement as to the rights of defendant Inés Marín in the amended judgment.

Instead of considering separately the errors assigned we will begin by setting out the evidence and then determine whether any error was committed in admitting it; whether the objection of *res judicata* was properly ruled upon, and

lastly, whether in case the complaint should be dismissed in whole or in part the prayer of the defendants in their cross-complaint can be sustained.

The evidence of plaintiff Pesquera consisted of:

1. Deed of bargain and sale of the "Maturí" property executed on July 13, 1898, by the Bishop of Porto Rico through his lawful representative in favor of the plaintiff, José Jesús Pesquera. Admitted without objection.

2. Certificate of the Registrar of San Juan to the effect that the sale of the property "Maturí" was recorded in favor of Pesquera in the registry. Admitted without objection.

3. Original record of proceedings instituted by plaintiff Pesquera in the Municipal Court of Bayamón on July 26, 1894, from which it appears that Pesquera stated to the court that he had purchased the "Maturí" property and that as there were upon it several houses belonging to different tenants, he prayed the court to notify said tenants that they should pay to Pesquera, the owner of the land, a monthly ground rental of one dollar for each house from and after August 1, 1894. Said record also showed that such demand for payment was served on each of the fifty tenants personally, among whom were defendants Salomé Fernández, Miguel González and Maximino Torres. Admitted without objection.

4. A certified copy of the record of the dominion title proceeding prosecuted by Pesquera. The said proceeding was begun in the Municipal Court of Bayamón and, being opposed by Enrique Salgado and others, was removed to the district court, which dismissed the contest on the ground that it was not made in the manner prescribed by the Mortgage Law. The dominion title proceeding was approved and recorded in the registry of property. The copy was admitted over the objection of the defendants on the ground that "the dominion title is null and void because the twenty years required by the Mortgage Law then in force had not expired."

5. An extrajudicial document executed by the Bishop of Porto Rico relative to the rebate of certain instalments of the annuity encumbering the "Maturí" property on account of the expenses incurred by Pesquera in suits against the tenants occupying the land. Finally admitted without objection.

6. Testimony of the plaintiff, who narrated the facts relating to the acquisition of the "Maturí" property and the prosecution of the possessory and dominion title proceedings, agreeing with what is shown by the documentary evidence. He testified further that when he bought the property it was occupied by about fifty persons, including defendants Salomé Fernández, Miguel González and Maximino Torres, and

"*  *  * that the bishopric had placed the lands known as 'Maturí' in the custody of the priest or priests of Bayamón and the priests authorized some persons to live upon it as tenants; that since the year 1904, when he had to bring an action in the Federal Court against one José Quirós, who attempted to secure a dominion title to a lot, some of the tenants began to refuse to pay their rents; not absolutely but by saying to the collector, 'Later; we have not the money now'; that he knows that the occupants of 'Maturí' built their huts there with the permission of the bishopric and under the promise to move when requested to do so; that so long as the bishopric was in possession of these lands none of the tenants claimed the ownership of the lots  *  *  *.

"That he was born in Bayamón, always resided there and was employed by the municipality of that town before establishing himself in San Juan; that as such municipal employee in 1875 he had an opportunity of knowing the conditions under which the defendants lived in 'Maturí,' for he was not only friendly with the priests but used to see persons bring notes from the priests to the mayor, reading more or less as follows: 'Permission is granted to So-and-so to build a hut (or house) and I request you to give him the necessary permit'; that thereupon the mayor would issue another permit and charge fifty cents as a tax for the municipal building license."

The evidence of the defendants and cross-plaintiffs consists of the testimony of twelve of them. A literal copy of

the said testimony taken from the statement of the case reads as follows:

"TESTIMONY OF DEFENDANT SALOMÉ FERNÁNDEZ.

"On direct examination he testified that he lives on a 6 by 8-meter lot in 'Maturí'; that he grew up there; that his grandmother lived and died there; that he continued to live there with ·his mother who also .died there; that he' continued to live there; that his mother died more than thirty years ago; that his aunt paid taxes under the Spanish Government and he remained there after her death; that his mother, his aunt and he· lived there as owners without permission from any· one; that five years ago Pesquera sued him for ground rent and witness told him that he did not acknowledge that he was the owner of the property; that he knows Pesquera; that he never sees him there; that sometimes Pesquera passed the place on his way to a stable and now passes it going to his farm; that in Spanish times he never saw Pesquera there.

"On cross-examination by plaintiff's attorney he testified that he does not know how old he is; that he does not remember in what year his mother died; that he knows it was more than thirty years ago, but cannot explain how he knows it; that his mother held the lot as owner and acquired it from his grandmother; that the latter purchased it from Catalino Matos; that Don Chucho bought it; that for more than forty years he has had the house in which he now lives; that Pesquera brought the sanitary authorities there and they made him tear down ·the house, and he built another house on the same spot; that Pesquera did that in order to obtain possession of the lot; that he now lives in a rented house in another ward called 'Vista Alegre'; that he has a house in 'Maturí' which he is now building; that for five years Pesquera has been harrassing him in the courts; that he knows it is five years but does not remember the date he began to do so; that he pays no taxes now because the house is demolished; that he paid no taxes last year, the year before, or in 1910 or. 1911; that in 1909 he went to see Fernando Montilla and told him that he wished to report in order to pay taxes on the lot and Montilla told him to build his house and he would then be entitled to pay taxes; that he did not pay taxes either in 1907 or 1908, for, as he previously stated, he paid no taxes from the time the house ceased to exist.

"In answer to a question put by the judge witness testified that the· Sanitary Department ordered him to tear down the house at the time of the plague. . .

"In answer to further questions from the bench witness testified that he did ̦ot pay taxes prior to the time of the plague because the house ̖ been already demolished; that the house was torn down at th ̖ne of the plague; that he paid taxes before the plague and up to t ̖time of the San Ciriaco hurricane.

"Upon f ̖rther cross-examination by plaintiff's attorney witness testified that he has paid no taxes since the time of the hurricane; that he paid for his house and for everything; that he does not remember the last year he paid taxes; that neither does he remember when his mother or when his grandmother died or how old he is.

"Upon redirect examination by his attorney witness testified that his mother died one or two years before the San Ciriaco hurricane; that he had a son who must be from 30 to 35 years old and who was born in 'Maturí'; that the witness never left that place until compelled to do so by the order of the Sanitary Department in order to repair the house; that his mother died some, or rather many, years after his grandmother died.

#### "TESTIMONY OF GABINA FIGUEROA.

On direct examination witness testified that she lives in 'Maturí' in a house formerly No. 42 but now No. 17, on a lot 8 meters in front by 40 meters deep, where she has lived since her birth; that her father died and her mother continued there; that her mother died three months ago and the witness was very young when her grandmother died; that she is 41 years old, was born at that place and still lives there as the owner; that her mother also lived there as the owner having acquired the lot from her husband, Pedro Figueroa, who also occupied the lot as the owner; that she does not know from whom Pedro Figueroa acquired the lot; that her mother was 60 years old when she died and lived there without permission from any one; that she pays no taxes because an internal-revenue assessor appraised the house and said she was not required to pay taxes; that Pesquera visits the property now, but did not do so in Spanish times.

"Cross-examined by the attorney for the plaintiff witness testified that she does not know in what year she was born and cannot read, but she knows she is 41 years old by her baptismal certificate; that the house in 'Maturí' in which she lives is No. 60. She repeats more or less what she testified on direct examination.

#### "TESTIMONY OF DEFENDANT MAXIMINO TORRES.

"On direct examination the witness testified that he lives in 'Maturí' where he occupies a lot 24 feet in front by 42 feet deep, con-

taining a house formerly No. 13 and now No. 135; that he is 58 years old and the owner of the house and lot from the time he was born; that his parents died when he was a child and his sister remained in charge until 1872, when she died, and he then assumed charge; that he was not notified in 1894 of any possessory title proceedings brought by the church and was not asked to pay rent until a few years ago when José Jesús Pesquera made his appearance and the witness told him that he was not aware that he was the owner, for he had lived there since his childhood and had not recognized any owner.

"Cross-examined the witness testified that he was about seven or eight years old when his parents died; that there were three children, one of whom died a short time ago. but they lived apart and he remained with his sister in her house and she died in 1872; that the witness was born in 1856, at which time all the occupants of the property were the owners; that at that time there were only ten or twelve small houses including that of his parents; that he knows the property 'Maturí' but does not know who is the present owner or who was the former owner; that he was not summoned by the secretary of the municipal court or by any one; that he has been paying taxes for three years to the Treasury, but cannot say how much, and knows only that they went there to take measurements and handed him a receipt; that he does not know whether he is paying taxes on the house or on the lot; that they measured the property, including the house.

### "TESTIMONY OF DEFENDANT JOSÉ SÁNCHEZ CRUZ.

"On direct examination the witness testified that he occupies a 28 by 42-foot lot in 'Maturí' containing a house formerly No. 10 but now No. 11; that he does not know why this action was brought against him; that he claims to be the owner of the lot he occupies because his mother left it to him; that his mother died there on June 19 of last year at the age of 95 years and he acquired title from her; that witness is 41 years old and he and his mother were born there; that his mother and his grandmother considered themselves the owners of that lot and their possession has been undisturbed; that during recent years Pesquera has interfered with his possession; that witness has never objected but told him to take legal action and the courts would decide; that prior to the claims of ownership by Pesquera nobody had ever made any demands and he cannot recall that his mother was notified of possessory title proceedings in the year 1894; that prior to the present claims of Pesquera

nobody had asserted ownership of the property, and that Pesquera did not go to the property formerly because it was a swamp.

"Cross-examined witness testified that he is a baker; that he inherited the house from his mother and she inherited it from his grandmother; that he does not know when his grandmother died; that he has never spoken of his father or of his grandfather and knows nothing about them. He refuses to answer as to when his grandmother died on the ground that he does not know how to read; that he does not know when she died; that he knows nothing of 'Maturí' except that small lot; that Juana de la Cruz pays taxes as the plaintiff has not yet made the transfer to him. He exhibits receipts for taxes paid on the house only; that he understands that the lot belongs to them; that he does not know whether his grandmother bought that lot; that he does not know under what title she built the house there; that he does not know whether she was the owner or how she obtained her rights there.

"On redirect examination witness testified that his grandmother acquired title through her ancestors; that she built the house as owner.

"TESTIMONY OF DEFENDANT MARCELINO PARDO.

"On direct examination he testified that he occupies a 24 by 42-foot lot containing a house No. 11; that he has lived there with his mother as owner since he was a child; that his mother died before the war with Spain and prior to the San Ciriaco hurricane, during the Spanish administration; that he does not know who was the owner at that time, but he does know that he lived there with his mother and had raised twenty children there; that prior to Pesquera's present claim nobody had made any demands upon him.

"Cross-examined witness testified that he is a baker; that he was born in Santa Cruz Street but left there when a child; that he does not know how many years he lived in Santa Cruz Street; that from the time he moved from Santa Cruz Street he has lived with his mother in 'Maturí'; that he does not know who lived there previously; that he knew of no owner of the land other than his mother, who died prior to San Ciriaco, but he cannot state positively whether she died before or after 1904; that the house belonged to his mother, but he is unable to say from whom she purchased it; that he pays taxes, but declines to state whether on the house or on the lot, stating that he pays only one tax; that Pesquera has been suing him continuously for the past eight or ten years; that he cannot say how many years.

"On redirect examination he testified that from the time he went there with his mother he has occupied the house and lot as owner.

## "TESTIMONY OF DEFENDANT MIGUEL GONZÁLEZ.

"On direct examination witness testified that he has a house, formerly No. 22 and now No. 1, 10 feet in front by 10 feet de ·p, and that both the house and the lot belong to him by inheritance from his mother, who died forty years ago; that he knows his mother has been dead that length of time because the house belonged to her when he was born and he remained in possession when she died; that his mother was the owner of the place where she lived by title of purchase from a person whose name he does not remember; that nobody went there to collect; that Pesquera has sued him because he went there to collect from him; that no person had demanded payment of rent prior to Pesquera.

"On cross-examination witness testified that his mother's name was Lucrecia Velázquez, who died a little over forty years ago, but he does not remember the exact time; that he is a laborer; that he has lived there since he was born, but does not know whether his mother made the purchase and continued to live there with the consent of the bishop; that during all the years of litigation between him and Pesquera he never heard any one say that the property belonged to the church.

## "TESTIMONY OF DEFENDANT ATILANO RIVERA.

"On direct examination witness testified that he occupies a lot 18 feet in front by 40 feet deep, containing a house formerly No. 1 and now No. 149, of which house and lot he has been in possession as owner about thirty years under title of purchase from one Benito Chevres, who told him that he was the owner of the house and lot; that he has been living in the house and on the lot for 25 or 30 years, during which time nobody has demanded payment of rent or ordered him to leave, and he does not know why José Jesús Pesquera has sued him.

"Cross-examined witness testified that he purchased a tumble-down shack from Benito Chevres; that he purchased the place for building purposes; that he does not remember the year but paid $25 for an old shack; that this is the first time that any claim has been made upon him or that he has been made a party to any suit; that he was summoned in a suit in the Federal Court but the attorney told him that nobody was required to attend.

"On redirect examination witness says that he paid Benito Chevres $25 for the place where he lived.

### "TESTIMONY OF DEFENDANT JULIANA ACEVEDO.

"On direct examination witness testifies that she occupies a lot 20 feet in front by 42 feet deep in 'Maturí,' containing a house No. 115, all of which she has owned since she was a child; that she was born there and her parents died there, which is why she says she is the owner of the house as well as of the lot; that her father died when she was eighteen months old and her mother when she was six years old, since when she has been the owner; that she did not know Pesquera during all that time and she never heard that the property belonged to the bishop or to the church or that the lot belonged to any one else.

"Cross-examined witness says that so far as she knows she is about 45 years old and was six years of age when her mother died and since that time has lived alone in the house; that her mother told her that the house belonged to her (witness's) father; that she was the only daughter and that her parents were not married.

### "TESTIMONY OF DEFENDANT DOMINGA MARÍN.

"On direct examination witness testifies that she occupies a lot 16 feet in front by 40 feet deep containing a house No. 4, which house and lot, she claims, is hers because she has been in possession since the death of her father and after the death of her mother who has been dead five years; that her mother took title from her (witness's) father, which she knows because her mother told her so; that she has been living there since the year 1881 and no one has required her to pay rent, nor has she heard it stated that those lands belonged to any one else; that she never saw Pesquera pass by there during the Spanish régime; that she does not know how her parents became the owners of that house and lot.

"Cross-examined by the attorney for the plaintiff witness testifies that she originally had a small house there and later changed it for another; that her mother died five years ago and her father died about the time of the San Felipe cyclone, but she does not know in what year; that it was her mother who exchanged the house as her father was already dead; that the two houses were located in 'Maturí,' but she does not know whether the exchange was made more or less than ten years ago; that she has lived in the house she now occupies since the death of her mother; that she does not know who was the owner of 'Maturí' before Pesquera; that she has never

known Pesquera as owner nor can she say with whose permission her father had a house there; that she only knows that some two or three years before the death of her mother the latter acquired the house in which the witness now lives by exchange for another which she had in another place; that Pesquera is always suing them.

"The attorney for the witness, on redirect examination, put the following question: 'You said that you lived there since 1881, is that so? Did you say that?' To which witness replied, 'I have lived there since 1881, in the same house I now occupy which my mother received in exchange for another.'

"Continuing, witness testifies on redirect examination that when her mother died five years ago she had exchanged that little house for the other; that her mother made the exchange two years before she died; that another man had a house higher up and her mother exchanged one lower down for it two years before her death; that the house in which she now lives is No. 4 and she has lived there for seven years; that they had another house in 1881 which her mother exchanged later for one lower down.

"In answer to a question put by the judge she said that her mother exchanged a house in 1881, since when no further exchange has been made.

"In answer to further questions put by the attorney for the plaintiff she ratifies her previous testimony that the house was exchanged by her mother two or three years before her death, which occurred five years ago. In answer to a question as to whether the San Ciriaco hurricane was before or after the year 1881 she replied that she is not talking about San Ciriaco.

"At this stage the attorney for the defendant intervenes in behalf of the witness, stating that witness does not understand the questions put by Mr. Anderson. Thereupon the judge questions the witness, designating as a starting point the San Ciriaco cyclone, and the witness answered that the exchange of the house took place after the San Ciriaco cyclone.

"TESTIMONY OF DEFENDANT ENRIQUE SALGADO.

"On direct examination witness testifies that he occupies a house in 'Maturí,' formerly No. 9 and now No. 13, on a lot measuring 10 feet in front by 40 feet in depth, which house and lot have been owned by him for eight or ten years; that the said house belonged to Louis López and was purchased by his mother-in-law, Dominga Marín, who has just testified; that Luis López did not live in that house and he does not know whether he had rented it or not; that his

mother-in-law lives eight or ten meters from his house in house No. 4, in which she lived since he has known her, and he has known her since he was a child and he is now 38 years old.

"Cross-examined witness testifies that his mother-in-law bought that house from Luis López eight or ten years ago for the witness because he had married one of her daughters; that she paid $45 for it but Luis López did not execute a deed; that he does not know the time Luis López lived in that house; that he has lived in 'Maturí' since he was a child and has known no one claiming to be owner, and no one prior to José Jesús Pesquera has gone there to collect rent; that formerly he did not pay taxes because it was an old shack, but he now pays 60 cents taxes without knowing what it is for, for they measured the ground in front and at the sides and he does not know whether they are collecting taxes on the house or on the lot; that no sales are made there under deed, the thing is delivered, money paid and the transaction completed; that he had a lawsuit with Pesquera in the Federal Court.

### "TESTIMONY OF WITNESS SALOMÉ FERNÁNDEZ.

"Salomé Fernández being recalled, testifies on direct examination that he knew Luis López who was the owner of a house in 'Maturí' which he sold to Dominga Marín; that Luis López had bought it from Amalia Blanco who had built it before the birth of a son of witness, who is nearly 32 years of age; that Enrique Salgado was engaged to a daughter of Dominga and the latter purchased the little house to give to him; that Enrique and the daughter of Dominga occupy the house at present.

### "TESTIMONY OF DEFENDANT RAMONA TIRADO.

"On direct examination witness testifies that she lives on a lot 16 feet in front by 40 feet deep, containing a house No. 12; that she has been living there from twenty to twenty-five years having taken title from María Monserrate, the grandmother of Sánchez, who was at the same time the owner of the lot for she herself said so; that María Monserrate was in possession of that lot for over seventy years and witness bought it for $30.

"Cross-examined witness testifies that she has been paying taxes for three years, not having paid previously because her house was a shack. She exhibits a receipt from which it appears that she pays taxes on the house alone, but she insists that she pays taxes on everything; that she has known 'Maturí' for a long time and has known

nobody claiming to be the owner; that she once brought an action against Pesquera, but did not continue it.

"TESTIMONY OF DEFENDANT MARCELINO CHAVER.

"On direct examination witness testifies that he is the owner of a house No. 9, which he acquired by title of purchase from a very old woman named Siña Paula forty years ago, since which time he has been living there and no one has collected rent therefor; that once he was sued in the Federal Court; that he has never been required to pay rent.

"Cross-examined witness testifies that he does not know who authorized him to live there.

"Salomé Fernández is recalled by his attorney and testifies that Inés Marín lived in the yard of his house and has no lot of his own."

With the evidence before us, let us see whether the objection by the defendants to the introduction by the plaintiff of the proceeding converting the possessory title into a dominion title is well founded. The said objection is based solely on the ground that the conversion was void because the twenty years prescribed by the Mortgage Law had not elapsed. This question was decided by this court in the case of *Damers et al.* v. *The Registrar,* 20 P. R. R., 195. The period of twenty years required by article 393 of the Mortgage Law was reduced to six years by the Judicial Order of April 4, 1899. Therefore, the possessory title proceeding having been recorded in 1894 and its conversion into a dominion title having been recorded in 1911, it is clear that the period of six years had more than elapsed, counting not only from 1894 but from April 4, 1899, when the judicial order was approved, and hence that the possessory title could be considered converted into a dominion title under the judicial order without applying the retroactive clause thereof. Therefore, the ruling of the court admitting the evidence was entirely correct.

Let us consider now whether the evidence sustains the plaintiff's plea of *res judicata,* not the failure of the court to rule upon it, as the appellant claims, but as decided im-

pliedly by the judge of the district court in the judgment. It appears from the evidence that the defendants, or some of them, opposed the conversion of the possessory title to the "Maturí" property into a dominion title and that their contest was dismissed because of defects of form. Even if the contest had been dismissed on its merits, the ruling of the court would not constitute *res judicata* as regards the rights of the contestants.    See *The People* v. *Dimas et al.*, 18 P. R. R., 1019.

Finally, let us see whether the court committed any manifest error in weighing the evidence by finding that it showed that the plaintiff is not the owner of the lots occupied by the defendants, but that, on the contrary, the defendants are the lawful owners of the same.

The principal action brought by the plaintiff in this case is that of ejectment, or an action which the owner of a thing may bring against the person possessing or detaining it. In an action of ejectment it is essential that the plaintiff prove not only his right to recover the thing detained, but the identity of the thing itself.

In this case there is no doubt as to the identity of the thing claimed. The houses of the defendants are built on lots whose dimensions are determined and all of them lie within the boundaries of the property known as "Maturí" which is recorded as a whole in the registry in the name of the plaintiff. The controversy is limited exclusively to whether the lots in question belong to the plaintiff or to the defendants.

In our opinion, if we consider the evidence of the plaintiff alone we must conclude that it shows a *prima facie* title, good and sufficient to prove his ownership of the whole of the "Maturí" property and, therefore, of the portions of it occupied by the defendants. In 1894 the bishopric of Porto Rico availed itself of the benefits of the Mortgage Law and instituted a proceeding to establish its possession

of the property in question as owner by title acquired by a grant from Bishop Zengotita ninety years before.

The proceeding was approved and recorded in the registry. In the same year of 1894 the bishopric sold the property to the plaintiff, Pesquera, and the latter recorded his title in the registry of property. In the year 1911 Pesquera, complying with the formalities prescribed by the Mortgage Law as amended by the Judicial Order of April 4, 1899, converted his possessory title into a dominion title and recorded the conversion in the registry of property.

Therefore, if we had to decide the case on the evidence of the plaintiff we should have to render judgment entirely in favor of his claims. Let us see whether the evidence of the defendants destroys the *prima facie* good title of the plaintiff. Said evidence consisted, as we have said, of the testimony of twelve of the thirteen defendants. The trial judge who heard them testify gave absolute credence to their testimony and we must do the same in the absence of a proper showing on the part of the appellant that their testimony was false or that in deciding the conflict between the said testimony and the results of the possessory title proceeding, of the proceeding converting the possessory title into a dominion title and of the testimony of the plaintiff, the trial judge was influenced by passion, prejudice or partiality, or committed a plain and manifest error.

On this basis the trial judge made the following findings of fact:

"4. That in April, 1894, when the possessory title to the property 'Maturí' was decreed in favor of the bishopric, some of the defendants and the ancestors and vendors of the others held actual possession as owners of several portions thereof, living in houses built by them.

"5. That the defendants have held quiet and peaceful possession as owners of the said portions of the 'Maturí' property for more than thirty years and each respective defendant is now in possession of the house and lot described in the fifth clause of the amended complaint.

"6. That plaintiff Pesquera has never been in possession of those parts of the property held by the defendants since the time he purchased the property 'Maturí' from the bishopric up to date, and until the year 1907 the plaintiff owed all the instalments of the annuity since the date of the execution of the deed of sale made to him by the bishopric.

"7. That the defendants, or their ancestors or grantors, who were in possession of the 'Maturí' property when the possessory title proceeding was approved in favor of the bishopric, were not summoned to appear at the hearing thereon, nor had any knowledge of the proceeding."

We have examined carefully the evidence of the defendants and, in our opinion, it is sufficient to sustain the findings transcribed above, but said facts are limited to defendants Salomé Fernández, Gabina Figueroa, Maximino Torres, José Sánchez Cruz, Marcelino Pardo, Miguel González, Juliana Acevedo, Dominga Marín, Enrique Salgado, Ramona Tirado and Marcelino Chaver. Accepting as true the testimony of these defendants, it may be concluded that when the possessory title proceedings were prosecuted and when the possessory title was converted into a dominion title, they, personally or through their ancestors, were in possession of their respective lots as owners, and that such possession in such character dated more than thirty years back from the date on which the complaint was filed. We have experienced some doubt in weighing the testimony of defendant Marcelino Pardo on this point, for at first sight he does not fix a definite starting point for the computation of prescription, but as the said defendant testified personally before the trial judge and stated that when a child he went to live with his mother on the lot referred to and that she died before the war with Spain and before the San Ciriaco hurricane, and the court was in a position to estimate his age, we have decided that we should resolve the doubt in favor of the conclusion reached by the trial judge.

Considering the evidence introduced in this case as a whole, the impression is conveyed that the property "Ma-

turí'' really belonged to the church. Due undoubtedly to the fact that it was situated on the outskirts of a town and to the fact, perhaps, that it belonged to the church for more than ninety years, many persons, some with and some without permission, entered upon the property and took possession of small portions of land and built their houses thereon. The very evidence of the plaintiff showed that when the church sold him the property ''Maturí'' in 1894 for $1,000, which he did not pay in cash but guaranteed by an annuity imposed upon the property, there were fifty tenants thereon against whom legal action was necessary. It seems that some left the property but others remained, maintaining that they were the owners. Among those who remained, according to the testimony of the plaintiff himself, were three of the defendants, and if all the occupants were summoned and the testimony of the defendants whose names we have given above is to be believed, all of them personally or through their ancestors remained there and opposed their rights against the right of the plaintiff. Nearly twenty years had elapsed when the plaintiff brought this action of ejectment and during all that time he had not succeeded in ejecting the said defendants. There is undoubtedly something irregular at the bottom of this case. The testimony of the defendants mentioned could have been clearer and more specific. Perhaps they took possession personally or through their ancestors without permission and knowing that the church was the owner, but the fact is that the years passed and that evidence has been introduced showing that for an uninterrupted period of at least thirty years before the filing of the complaint they held possession as owners without paying any rent for the land. If the original owner, the church, abandoned its rights and if the plaintiff, who acquired title from it, has not known or has been unable to assert his rights in time, both must suffer the consequences of their own acts. Ownership is lost or acquired by prescription and in order to acquire title by

the extraordinary prescription of thirty years neither just title nor good faith is required.

As to defendant Atilano Rivera, even if his testimony be deemed credible it does not show that he held the land as owner for thirty years prior to the filing of the complaint. The said defendant could not establish an adverse title stronger than that of the plaintiff, therefore that of the latter remains in full force and effect.

Defendant Inés Marín did not appear at the trial in the lower court and Salomé Fernández, another of the defendants, testified that he lived in the yard of his house and had no lot of his own. The plaintiff, Pesquera, began to testify by describing each of the places occupied by the defendants in the "Maturí" property, the attorney for the defendants admitting the accuracy of such descriptions as they appeared in the complaint, and it is shown in the complaint that Inés Marín occupies a lot 12 feet in front by 40 feet in depth, with a house thereon, No. 86. The trial court, by an order of May 17, 1914, entered a decision *nunc pro tunc* in order to adjust its judgment of January 12 to the decision rendered to the effect that the defendants, with the exception of Inés Marín, were the owners of the lots occupied by them. If we were required to weigh the evidence, we would say that in order to decide the conflict between the testimony of the witness and the admission of the attorney for the defendants, the latter should prevail, and that as defendant Inés Marín failed to show in any way that he had a right to occupy the lot described in the complaint, as to him the complaint should be sustained. However, as it is not shown clearly that the lower court exercised its discretion in that respect, we are of the opinion that we should decide the case of Inés Marín in the manner hereinafter set forth.

Another question to be considered is whether the pronouncement of the judgment should be extended, as to the

eleven defendants first named, to holding that they have
the absolute ownership of the lots occupied by them and to
decreeing the nullity of the plaintiff's title and the cancel-
lation of its record in the registry in so far as the same affects
the rights of the said defendants, or whether it should be
limited to dismissing the complaint and the cross-complaint
in which the cross-plaintiffs jointly pray that they be ad-
judged the owners of the lands occupied by them; that the
possessory title proceeding and its conversion into a domin-
ion title be declared null and void in so far as it may affect
them, and that the cancellation of their records in the regis-
try of property be ordered.

If the defendants had resorted voluntarily to the courts
for the relief prayed for in the cross-complaint, it is doubt-
ful at least whether they could have done so jointly under
the provisions of sections 65 *et seq.* of the Code of Civil Pro-
cedure, and as, moreover, it may be deduced from the tes-
timony of the defendants that there may be other persons
related to the defendants who might have an interest in the
lots in question, the judgment should be limited to decid-
ing the real issue finally and properly joined and discussed,
namely, whether the plaintiff is at present the real owner
of the lots he claims.

In our opinion his title to all of the "Maturí" property
may be considered good and sufficient, but without legal effect
as regards the lots occupied by defendants Salomé Fernán-
dez, Gabina Figueroa, Maximino Torres, José Sánchez Cruz,
Marcelino Pardo, Miguel González, Juliana Acevedo, Do-
minga Marín, Enrique Salgado, Ramona Tirado and Marce-
lino Chaver, because although it appears that his grantor
was, perhaps, the former owner of said lots it lost its title
thereto by prescription. Plaintiff's title is good as regards
the lot occupied by defendant Atilano Rivera. It is good as
to the lot occupied by defendant Inés Marín, but as this

last point was not decided clearly by the lower court, it should be given an opportunity to fix its findings of fact and conclusions of law.

As to the claims of the parties for damages, no specific evidence has been introduced to show what damages may have been caused. Both claims should be dismissed.

In view of all the foregoing we are of the opinion that the judgment appealed from should be affirmed only in so far as it dismissed the complaint with respect to defendants Salomé Fernández, Gabina Figueroa, Maximino Torres, José Sánchez Cruz, Marcelino Pardo, Miguel González, Juliana Acevedo, Dominga Marín, Enrique Salgado, Ramona Tirado and Marcelino Chaver, and reversed as to all the other pronouncements contained therein, sustaining the complaint as to defendant Atilano Rivera and ordering him to vacate the lot which he occupies in the "Maturí" property within a period of twenty days from the time notice of this judgment is served upon him. The district court will proceed to render judgment sustaining the complaint as to defendant Inés Marín or hold a new trial in order to determine the rights of the plaintiff and of said defendant Inés Marín in case the court should not have held that the evidence introduced showed that Inés Marín holds the lot described in the complaint without any right or title. The cross-complaint should be dismissed and, in view of the attendant circumstances, each party should pay his own costs.

> *Affirmed as to dismissal of complaint against eleven of the defendants and reversed on all other points.*

Justices Wolf, Aldrey and Hutchison concurred.

Mr. Chief Justice Hernández took no part in the decision of this case.